UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

CHARLES L. WEST                                              PLAINTIFF

VS.                                   CIVIL ACTION NO. 3:07CV581TSL-JCS

UNITED STATES OF AMERICA                                     DEFENDANT

MEMORANDUM OPINION AND ORDER

Plaintiff Charles L. West brought this action against the United States seeking to recover damages for injuries he suffered as the result of alleged medical negligence during eye surgery performed at the Jackson VA Medical Center. The case was tried to the court over three days beginning April 6, 2009. Having heard and considered the testimony of the witnesses and the documentary evidence, the court finds that Mr. West proved by a preponderance of the evidence that the VA breached the standard of care, that this breach proximately caused his injury, and that plaintiff is entitled to recover damages from the United States to compensate for this injury.

As a preliminary matter, the court notes that on May 8, after the case had been fully tried and submitted and while the parties were awaiting the court's ruling, Mr. West passed away. There is currently pending a motion by Susan Armstrong, Administratrix of the Estate of Charles L. West, pursuant to Rule 25(a) of the Federal Rules of Civil Procedure, for an order substituting the

Estate of Charles L. West, Deceased, as plaintiff. The motion to substitute will be granted. See Fed. R. Civ. Proc. 25(a) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative.").

The evidence at trial established the following: Charles West, a veteran of World War II, suffered significant damage to the corneas of both eyes during a cosmetic procedure performed at the Veterans' Affairs Medical Center (JVAMC) located in Jackson, Mississippi on March 10, 2006. The involved procedure, known as blepharoplasty, is designed to remove sagging skin between a patient's eyebrow and eyelid which tends to obstruct vision and cause discomfort. Prior to the surgery, Mr. West's vision was good, 20/40 in his right eye and 20/30 in his left eye. However, he decided to have the procedure because the loose skin above his eyes was a nuisance--he sometimes had to hold open his eyelids or tilt his head to improve his line of vision-and because he understood from Dr. Daniel K. Kim, an ophthalmology surgeon at the VA, that blepharoplasty was a standard procedure and a quick way to improve his peripheral vision and thereby improve his quality of life. Unfortunately, however, during the procedure, Mr. West suffered chemical burns to his corneas, which caused severe vision loss in both of his eyes. Mr. West contended that the damage to

2

his eyes was most likely caused by negligence on the part of the nurse who prepped him for surgery, and more particularly, he contended that the damage to his eyes was most likely caused by the prep nurse's use of Betadine scrub, or by undiluted Betadine solution, to prep him for surgery instead of a properly diluted Betadine solution; he contended the Betadine scrub or undiluted solution got into his eyes before and/or during the surgery, resulting in chemical burns to his corneas. Having considered the evidence, and taking into account the parties' arguments, the court agrees that an inappropriate Betadine formula was the likely cause of Mr. West's injury.

The liability of the United States under the Federal Tort Claims Act (FTCA) is generally determined by reference to state law. Molzof v. United States, 502 U.S. 301, 305, 112 S. Ct. 711, 116 L. Ed. 2d 731 (1992). Because the alleged negligent acts occurred in Mississippi, Mississippi law governs the issue of liability. Urbach v. United States, 869 F.2d 829, 831 (5th Cir. 1989). Under Mississippi law, to establish his claim against the Government, Mr. West was required to prove the following elements by a preponderance of the evidence: (1) a duty to conform to a certain standard of care; (2) a breach of that duty; (3) proximate cause; and (4) resulting damage. Barner v. Gorman, 605 So. 2d 805, 808-09 (Miss. 1992). In the court's opinion, while plaintiff's proof in this case is hardly overwhelming and leaves

3

ample room to question what happened to cause Mr. West's injury, the court is satisfied that Mr. West established each of the elements of his claim by the requisite preponderance of the evidence.

The court observes, first, that the evidence leaves no room for doubt that the standard of care required that Mr. West be prepped for eye surgery with Betadine solution diluted with sterile water from a concentration of 10% providone iodine to a concentration of 5%. Every witness who testified on the issue confirmed this to be the case. The witnesses also agreed it would be a violation of the standard of care to use undiluted Betadine solution or to use Betadine surgical scrub, whether diluted or not. Moreover, all agreed that Betadine surgical scrub could cause corneal burns if it got in the eyes, and Drs. Kim, Shiela Mahadviana and Peter Zloty agreed that undiluted Betadine solution could cause corneal burns, especially if allowed to remain in the eyes for an extended period of time.

The parties are in complete disagreement on the issue of whether the prep nurse, in fact, used Betadine surgical scrub or undiluted Betadine solution in prepping Mr. West for surgery, and as to the likelihood that such substance got into Mr. West's eyes and/or could have been in his eyes long enough to cause the injury he suffered even if an inappropriate formulation was used. The

court is persuaded that the evidence tends to support plaintiff's position on these issues.

At trial, the Government offered the testimony of its proposed expert, Dr. Bo Huang, as to the cause of Mr. West's injury. Prior to trial, plaintiff had moved to exclude testimony from Dr. Huang on the basis that in his written report, Dr. Huang was unable to identify the cause of plaintiff's injury to a degree of medical probability. Rather, he opined only that Mr. West may have "underlying corneal conditions" which might have caused him to suffer a rare toxic reaction to one or more "possible offending agents," including "standard Betadine prep solution," or one of the numbing agents used during his surgery. When deposed, Dr. Huang made clear that he could not state to a degree of reasonable medical certainty that Mr. West had any such underlying corneal condition because there was nothing in the medical records to indicate he had such a condition. He further admitted that he could not state to a degree of reasonable medical certainty that Mr. West suffered a rare toxic reaction due to any such underlying condition, and admitted that this was just speculation on his part. Ultimately, he testified that he could only identify multiple agents that "could cause" Mr. West's injury, and that he could not identify with reasonable medical certainty the agent or agents which did cause the injury. To the question, "Your opinion is that you're certain that there are certain agents that you

speculate could have caused his injury, but you don't know what caused his injury, when or how, right?," Dr. Huang responded, "That's right."

During pre-trial proceedings, the court indicated to the parties that while it would not bar the United States from presenting Dr. Huang's testimony at trial, the court would likely disregard any testimony or opinion him might offer as to the cause of Mr. West's injury in light of his inability to state any opinion as to the cause of Mr. West's injury to a reasonable degree of medical certainty.  Notwithstanding the court's statement to this effect, Dr. Huang was presented by the United States at trial, and he testified,

> I can say with a reasonable degree of medical certainty that the – one of the numbing agents ... are probably the ones involved in having damaged Mr. West's cornea in this case.

Mr. West's attorney objected to Dr. Huang's testimony, which he correctly characterized as a new opinion which had not previously been disclosed.  The court reserved ruling, but now sustains the objection and concludes that any opinion offered by Dr. Huang as to the likely cause of Mr. West's injury should be stricken.  Dr. Huang admitted in his deposition that he could not state the cause of Mr. West's injury to a reasonable degree of medical certainty. Although Dr. Huang is a treating physician, he is nevertheless required disclose opinions not encompassed by his medical records, failing which his opinions are properly stricken.  See Francois v.

6

Colonial Freight Systems, Inc., Civ. Action No. 3:06-cv-434-WHB-LRA, 2007 WL 4564866, 5 (S.D. Miss. Dec. 21, 2007) (explaining that "if the attorney wishes to elicit from the treating physician an opinion not set forth in the physician's office records, he should submit a written report signed by the treating physician as required by the rules or suffer the consequence of having an objection to that opinion sustained at trial") (quoting Robbins v. Ryan's Family Steak Houses East, Inc., 233 F.R.D. 448 (S.D. Miss. 2004), which interpreted and applied 26.1(A)(2)(d) of the Uniform Local Rules to treating physicians who are designated as experts). Even were the court not to strike his opinion, the court would still disregard it, since Dr. Huang offered no explanation as to how he was previously able only to identify "possible" causes and yet is now able to single out the "probable" cause.

As to the probable cause of Mr. West's injury, the court finds especially pertinent and persuasive the impressions reported by Dr. Kim, who performed the surgery, on the results of his own investigation into Mr. West's injury. Dr. Kim's impression, as set forth in his operative report, was that Mr. West had suffered "bilateral corneal edema" (corneal swelling in both eyes).[1] Dr.

---

[1] The court notes that as evidence that Mr. West was prepped with Betadine surgical scrub, plaintiff directs the court to Dr. Kim's operative note, in which he stated that Mr. West was "prepped and draped in the usual fashion with Betadine hand scrub." In the court's opinion, however, Dr. Kim's statement in this regard is not probative because (1) Dr. Kim was not in the operating room when Mr. West was prepped for surgery, and (2) his

7

Kim's investigation in the days, weeks and months following the surgery involved his ruling out possible causes of Mr. West's injury. His initial impression was recorded in his operative report, in which he stated, "The conditions could be that some Betadine may have fallen into the fornix and caused the corneal edema or he may have developed an idiopathic reaction to one of the agents used." As part of his investigation into the likely cause of Mr. West's injury, Dr. Kim had Mr. West evaluated for an underlying autoimmune disease that may have rendered him predisposed to an adverse reaction; but testing revealed "no evidence of autoimmune disease." Dr. Kim further concluded, and confirmed in his testimony, that Mr. West's injury was not due to an allergic reaction. Rather, it was clear to Dr. Kim that Mr. West had sustained a toxic chemical reaction and had no underlying predisposition to having such a reaction. And Dr. Kim consistently identified Betadine as the chemical most likely to have caused Mr. West's injury.

Following his operative note, dictated March 10, in which he speculated that "some Betadine may have fallen into the fornix and caused the corneal edema," Dr. Kim made a handwritten notation on March 13 that Mr. West suffered a "toxic reaction to Betadine." On March 17, 2006, he noted that Mr. West "most likely" suffered a

---

statement is plainly internally contradictory, since it is not the "usual fashion" to prep a patient for eye surgery using Betadine "hand scrub," or any kind of Betadine "scrub."

8

"toxic reaction to the Betadine." On March 20, he noted that Mr. West had suffered a "severe chemical cornea/conjunctival injury" secondary to Betadine. On March 27, 2006, he again noted his impression that Mr. West had suffered a "bilateral corneal injury" which was "most likely" secondary to Betadine exposure. On March 31, following a second procedure by Dr. Kim,[2] he recited in his operative report that Mr. West "has a non-epithelial defect [in] both eyes, most likely secondary to chemical Betadine reaction." Three months after the procedure, during the VA's "Root Cause Analysis" of Mr. West's injury, Dr. Kim again opined that "the only possible agent is Betadine used in the prep." Although at trial, Dr. Kim testified that he was only able to say that Betadine was a possible cause of Mr. West's injury, the court finds highly persuasive his contemporaneous conclusions that the likely cause of Mr. West's injury was the "Betadine used in the prep," whether undiluted Betadine solution or Betadine scrub. And since it is agreed that the use of either was a violation of the standard of care, the court finds that Mr. West established his claim in this cause by a preponderance of the evidence. That brings the court to the issue of damages.

---

[2] The second procedure, a tarsorrhaphy, involved sewing the eyelids closed to try to help the epithelial layer regenerate correctly. This procedure was recommended by Dr. Connie McCaa, a corneal specialist, who was asked by Dr. Kim to examine Mr. West following the surgery.

9

Plaintiff is entitled to recover the total of any actual damages, together with noneconomic damages of up to $500,000 proven by a preponderance of the evidence to have been proximately caused by the negligence of the JVAMC. See Miss. Code Ann. § 11-1-60. "Actual damages" is defined to include "objectively verifiable pecuniary damages arising from medical expenses and medical care, rehabilitation services, custodial care, [and] disabilities." Id. § 11-1-60(1)(b). "Noneconomic damages" is defined to include "subjective, nonpecuniary damages arising from ... pain, suffering, inconvenience, mental anguish, worry, emotional distress, ... physical impairment, disfigurement, ... loss of the enjoyment of life, hedonic damages, other nonpecuniary damages, and any other theory of damages such as fear of loss, illness or injury." In this case, plaintiff seeks to recover an award of damages for past and future medical expenses and home health care, and for past and future emotional distress/noneconomic damages. Regarding the claim for future damages, in correspondence to the court, the Government has argued that "the interests of fairness and justice lean toward not awarding future damages to someone who died before the Court's decision in this matter." However, based on its review of pertinent authorities, the court concludes that it is appropriate in the circumstances presented to enter an order and judgment nunc pro tunc, effective as of April 8, 2009, the date the trial of

10

this case ended, awarding not only past damages, but also such future damages as are supported by the evidence adduced at trial.

The Supreme Court long ago held that where a party dies after the case is submitted, but before the court's opinion issues, a judgment may be entered nunc pro tunc to a date prior to the party's death. In Mitchell v. Overman, 103 U.S. 62, 64-66 (1880), where the plaintiff died after the case had been submitted but prior to a judgment in his favor, the Court held that a nunc pro tunc order should be entered so as not to prejudice the plaintiff from the court's delay in ruling, stating the applicable principles in this way:

> The adjudged cases are very numerous in which have been considered the circumstances under which courts may properly enter a judgment or a decree as of a date anterior to that on which it was in fact rendered. It is unnecessary to present an analysis of them, some of which are cited in a note to this opinion. We content ourselves with saying that the rule established by the general concurrence of the American and English courts is, that where the delay in rendering a judgment or a decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment or the decree may be entered retrospectively, as of a time when it should or might have been entered up. In such cases, upon the maxim actus curioe neminem gravabit,–which has been well said to be founded in right and good sense, and to afford a safe and certain guide for the administration of justice,–it is the duty of the court to see that the parties shall not suffer by the delay. A nunc pro tunc order should be granted or refused, as justice may require in view of the circumstances of the particular case. These principles control the present case. Stutzman was alive when it was argued and submitted. He was entitled at that time, or

> at the term of submission, to claim its final
> disposition. A decree was not then entered because the
> case, after argument, was taken under advisement. The
> delay was altogether the act of the court. Its duty was
> to order a decree nunc pro tunc, so as to avoid entering
> an erroneous decree.

The Fifth Circuit has recognized this rule. See U.S. v. Hitchmon, 587 F.2d 1357, 1360 (5th Cir. 1979) (stating that "[o]rders may be entered nunc pro tunc to the end that the record accurately reflect what was actually done on a previous date or to protect the parties from the consequences of delay by the court not attributable to any fault on their part," and citing Mitchell for Court's upholding entry of judgment nunc pro tunc "where plaintiff had died after the case was argued and submitted to lower court but before actual rendition of judgment"). A number of other courts have recognized and applied this rule. See, e.g., Padgett v. Nicholson, 473 F.3d 1364, 1367 (Fed. Cir. 2007) ("Where a party dies after his case is submitted, but before the opinion issues, and the case would otherwise be rendered moot, the Supreme Court has consistently entered judgment nunc pro tunc to the date of the party's death."); Weil v. Markowitz, 898 F.2d 198, 201 (D.C. Cir. 1990) ("The paradigm case (for entering an order nunc pro tunc) involves a party who has died after his case has been submitted to the court, but before the court has entered judgment.");

 In this case, at the close of the evidence, the court directed that the parties submit written closing arguments, rather than presenting oral arguments, and it granted the parties two

12

weeks within which to submit their arguments.  The court received proposed findings and conclusions from both sides on April 24, and was preparing to render its opinion in favor of Mr. West when it was informed of his death.  In short, the court did not rule immediately upon the close of the evidence but instead took the case under advisement, and then delayed ruling so that it could receive the parties' written arguments and then further failed to rule promptly upon receipt of the parties' submissions.  Clearly, the delay in ruling was not the fault of Mr. West or his counsel, but rather was for the court's convenience.  The Mitchell Court's holding applies here: "[Mr. West] was alive when it was argued and submitted.  He was entitled at that time, or at the term of submission, to claim its final disposition.  A decree was not then entered because the case, after argument, was taken under advisement.  The delay was altogether the act of the court.  Its duty was to order a decree nunc pro tunc, so as to avoid entering an erroneous decree."

At the time the case was submitted, Mr. West was alive, and was entitled to an award not only of past damages but also of such future damages as he proved he would likely suffer as a result of his injury based on a life expectancy of 3.8 years, as established by the evidence at trial.[3]  Because the court concludes that entry

---

[3] On the date of trial, Mr. West was about to turn 92 years old.

13

of a nunc pro tunc order is appropriate, Mr. West's subsequent death will not impact this court's factual findings based on the evidence presented, even with respect to an award for future damages.

Mr. West presented evidence that he incurred $14,705.13 in past medical expenses, consisting of VA medical bills totaling $3,690.25, VA pharmacy charges of $493.71, charges of $9,896.17 from Dr. Connie McCaa and $625.00 in expenses for Jackson Eye Associates. The Government does not dispute that these charges were proximately incurred by Mr. West as a result of the injury he sustained in the surgery of March 10, 2006, and this amount will be awarded.

In addition, plaintiff seeks to recover $140,049 in past expenses for home health care for Mr. West, covering the three-year period from the time of surgery to trial. The evidence at trial established that prior to his surgery at the JVAMC, Mr. West's vision was quite good, and that as a result of the injury he sustained during the surgery at the JVAMC, his vision was significantly impaired. The precise extent of this impairment is disputed by the parties. Mr. West took the position at trial that he was rendered legally and functionally blind as a result of this injury; the Government contends that Mr. West did not meet the statutory definition for legal blindness in Mississippi, which requires visual acuity of less than 20/200 in both eyes or a field

14

restriction of 20 degrees or less.  See Miss. Code Ann. § 27-7-21. In the court's opinion, the evidence reasonably establishes that there were times when Mr. West met the statutory definition of legally blind and other times when he may not have qualified as legally blind.[4] But regardless of whether he was "legally blind," it is manifest that the loss of vision he experienced was severe. Following the surgery, Mr. West could no longer see to drive, or to read or write.  He could not see to watch television (unless, as he put it, his "nose was touching the screen").  He could not recognize people; he could only distinguish a person's race, or the color of his or her clothing, if the person was close to him and the lighting was just right.  As a result of his loss of vision, Mr. West became dependent on others for his care.  He required assistance with has personal care, including bathing or showering, and shaving.  He could no longer cook and needed someone to prepare and serve his meals.  He could no longer walk without using a walker; and because of the high risk of falling,

---

[4] An explanation of this was offered by plaintiff's expert Dr. Peter Zloty who testified that at times, scars of a sort would form over the epithelial layer of Mr. West's eyes, causing his vision to worsen. Whether Mr. West was "legally blind" on a given day depended on how severe the scars were that day.

And according to the testimony of Dr. Robert Mallette, one of plaintiff's treating physicians, whose testimony the court found reasonable and credible, it could not be reliably determined whether Mr. West was legally blind due to a field restriction of 20 degrees or less because "[i]n patients with vision this poor, it is very difficult to formally check a visual field and have it be accurate."

he needed someone to help him get around without tripping or running into things.

The proof at trial showed that immediately following the surgery, Mr. West had a sitter around-the-clock, seven days a week. After a period of time, due to the expense involved, this was cut back to fifteen hours a day, and eventually, was further reduced to ten hours a day, six days a week. The Government does not dispute that Mr. West, in fact, required these home health care services as a result of his eye injury, and it does not dispute that the cost of past home health care which plaintiff seeks to recover herein was incurred as a proximate result of his injury. It does submit that it is entitled to set off $45,000 which it has already paid for such care. The court agrees, and concludes, therefore, that an award of $95,049 for past home heath care is warranted.

As for future care, Mr. West sought an award of $383,040.00 based on his assertion that he would require future home health care "24/7" at the rate of $12.00 per hour for the remainder of life, based on a 3.8 year life expectancy. The Government did not deny that Mr. West would require daily assistance, though it did undertake to imply at trial that he would not need such care during the night, while sleeping. The court is not persuaded that Mr. West would have required home health assistance "24/7" and concludes that he was apparently managing reasonably well having a

sitter 10 hours a day, rather than 24 hours. Accordingly, the court will award $138,700 for future home health care.

Mr. West also sought to recover future medical expenses of nearly $20,000 for corneal transplant surgery. However, the court rejects this request, based on the testimony of Dr. Robert Mallette, one of plaintiff's treating physicians, that a corneal transplant "would almost certainly fail in either eye." Finally, whereas Mr. West requested an award of $1200 for future quarterly eye exams (12 exams at $100 per exam), Dr. Mallette testified that Mr. West would not necessarily have required exams quarterly, but rather that twice a year would likely have been adequate. Accordingly, an award of $600 is proper.

Mr. West urged the court to award $500,000, the maximum amount of noneconomic damages recoverable under Mississippi Code Annotated § 11-1-60, for the extreme physical and emotional pain and distress, and loss of enjoyment of life, he endured as a result of his injury. As demonstrated by the evidence at trial, prior to his surgery in April 2006, Mr. West had good vision and, despite his advancing years, he enjoyed an active and independent lifestyle. He was fully able to care for himself, and was able to engage in and enjoy many hobbies and activities. At trial, Mr. West credibly described the devastating impact his vision loss had on his daily life and the emotional distress he had suffered as a result, in addition to the physical disfigurement, pain and

17

incapacity. His testimony was supported and confirmed by that of his sister and niece. The court finds that their testimony, and the evidence as a whole, fully supports the request for the maximum amount of noneconomic damages recoverable, $500,000.[5]

Based on the foregoing, therefore, the court finds that the plaintiff, which is now the Estate of Charles L. West, is entitled to a verdict and an award of actual damages of $249,054.13, and noneconomic damages of $500,000, for a total award of $749,054.13.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 20th day of July, 2009.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[5] In fact, but for the statutory cap, the court, taking into account future noneconomic damages, would have been inclined to award more than $500,000. Thus, even if future damages were not appropriate in view of Mr. West's having died following trial, the court would likely have awarded an amount approaching $500,000 for his past suffering, which clearly has been extreme.